**Maurice TURNER, et al., Appellants,**

v.

**FRATERNAL ORDER OF POLICE,
et al., Appellees.**

**No. 83–1213.**

District of Columbia Court of Appeals.
Argued July 24, 1984.
Decided Nov. 13, 1985.

Richard B. Nettler, Asst. Corp. Counsel, with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Asst.

---

Corp. Counsel, Washington, D.C., were on brief, for appellants.

Roger P. Widing, Washington, D.C., for appellees. Robert E. Deso, with whom Robert E. Greenberg, Washington, D.C., were on brief. Arthur B. Spitzer, Elizabeth Symonds, and Timothy S. Hardy, Washington, D.C., also entered an appearance for appellees.

Daniel J. Popeo and Paul D. Kamenar, Washington, D.C., were on brief for amicus curiae, Washington Legal Foundation, on behalf of appellants.

Before NEBEKER and BELSON, Associate Judges, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

This is an appeal from an order of the Superior Court of the District of Columbia enjoining enforcement of Paragraph 2 of Special Order 83–21 of the Metropolitan Police Department ("the Department").[1] Appellants Maurice Turner, Jr., Chief of Police, and the District of Columbia contend that the trial court committed error in granting the preliminary injunction and finding Paragraph 2 to be unconstitutional. We agree and reverse.

On March 2, 1983, Chief of Police Maurice Turner, in an effort to enforce the Department's long-standing policy against the illicit use of narcotics and controlled substances by members of the police force, issued Special Order 83–21. Paragraph 2 of the Order provides that any Department official may order any member of the force to submit to urinalysis testing[2] upon suspicion of drug abuse. Such testing may also be mandated at the discretion of a member of the Board of Police and Fire Surgeons. The Special Order further provides that an officer's refusal to undergo testing, or a "confirmed finding of an illicit narcotic or controlled substance," results in a proposal for terminating that individual from the Department.

The facts in this case were not developed in the trial court so as to enable a decision in this court on the constitutionality of the regulation as applied to appellee Officer Buie. There was no hearing on the facts and no findings were, or could be, made by the trial court. We will, however, consider the issue of facial constitutionality.

Appellees Buie and the Fraternal Order of Police, Metropolitan Police Department Labor Committee ("FOP"), immediately filed a complaint in the Superior Court seeking declaratory and injunctive relief. They also made an application for a temporary restraining order and filed a motion for a preliminary injunction to enjoin enforcement of Paragraph 2 of the Special Order. The trial court issued the temporary restraining order[3] and also prohibited the Department from issuing similar orders pending resolution of the present controversy after a full hearing on the merits.

The trial court conducted a hearing on appellees' motion for a preliminary injunction. On September 9, 1983, it granted the preliminary injunction and held that Paragraph 2 of Special Order 83–21 was unconstitutional, because:

[I]t provides no guidelines under which such testing referred to in the order may

---

**1.** Special Order 83–21, "Drug Testing for Illicit Narcotic or Controlled Substance Use," specifically provides:

Additionally, the Police and Fire Clinic will conduct urinalysis testing for narcotic or controlled substance use by any member of the force suspected of such drug use, as directed by any official of the Department. Members may also be directed to submit to urinalysis testing at the discretion of a member of the Board of Police and Fire Surgeons.

**2.** The Police and Fire Clinic analyzes the urine sample for the presence of illicit narcotics by administering a test known as EMIT Cannabinoid Assay (EMIT). This test is used primarily to detect the presence of metabolites of the psychoactive chemical which produces the intoxicating effect associated primarily with the use of marijuana and hashish. The test can detect the presence of narcotics for a period of seven days or more after use.

**3.** On August 2, 1985, this court issued a stay of the preliminary injunction.

be ordered or directed, and without such guidelines testing may be ordered under such circumstances as to be unreasonable and, therefore, in violation of the Fourth and Fifth Amendments of the Constitution of the United States.

This appeal followed.

Injunctive relief is an extraordinary remedy and the trial court's authority to issue such relief should be exercised only when satisfied that the movant has clearly demonstrated the following: (1) a substantial likelihood of success on the merits; (2) irreparable harm that would likely befall him during the pendency of the action; (3) that the denial will cause him more harm than the grant would the defendant; and, in appropriate cases, (4) that the public interest would not be disserved by the issuance of the requested order. *Wieck v. Sterenbuch,* 350 A.2d 384, 387 (D.C.1976) (footnote citations omitted). Ordinarily appellate review of the grant or denial of injunctive relief is focused on an evaluation of whether the trial court abused its discretion. *Stamenich v. Markovic,* 462 A.2d 452, 456 (D.C.1983). Where, however, the trial court's action "turns on a question of law or statutory interpretation, we may reach the merits of the controversy." *Don't Tear It Down, Inc. v. District of Columbia,* 395 A.2d 388, 391 (D.C.1978) (citations omitted); *District of Columbia Unemployment Compensation Board v. Security Storage Co. of Washington,* 365 A.2d 785, 787 (D.C.1976), *cert. denied,* 431 U.S. 939, 97 S.Ct. 2651, 53 L.Ed.2d 256 (1977). Since this appeal involves a constitutional challenge to a special order of the Metropolitan Police Department, we elect to review this case on the merits of the controversy.

The question presented on appeal is whether, consistent with the Fourth Amendment,[4] the Department for administrative purposes may compel police officers to submit to urinalysis testing based upon "suspected drug use" or "at the discretion" of members of the Board of Police and Fire Surgeons. We conclude that it may.

■■ The Fourth Amendment protects an individual's reasonable expectations of privacy from unreasonable intrusions by the state. *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). In determining whether an individual has a reasonable expectation of privacy and whether the governmental intrusions are reasonable, courts have generally weighed the need to seize against the invasion which the seizure entails. *See Camara v. Municipal Court,* 387 U.S. 523, 534–35, 87 S.Ct. 1727, 1733–34, 18 L.Ed.2d 930 (1967). In striking this delicate balance, our inquiry in this case necessarily focuses upon whether, under these circumstances, a police officer has a legitimate expectation of privacy in his person to this extent and whether the Department's action would have been unnecessarily intrusive.

■■ Fourth Amendment protections extend only to those areas in which an individual has a "legitimate expectation of privacy." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). Each individual's privacy interest is shaped by the context in which it is asserted. *United States v. Thomas,* 729 F.2d 120, 123–24 (2d Cir.1984); *see also Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968). "What is reasonable in one context may not be reasonable in another." *Committee for GI Rights v. Callaway,* 171 U.S.App.D.C. 73, 83, 518 F.2d 466, 476 (1975). Consequently, not all individuals enjoy the same expectation of pri-

---

**4.** The Fourth Amendment (which is applied to the States through the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961) ), provides:

[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not

be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

vacy and, therefore, not the same degree of Fourth Amendment protection.

Military personnel, for example, have not been accorded Fourth Amendment protection to the same degree as their civilian counterparts. *Id.* The conditions peculiar to the military community and mission cause the military person's expectation of privacy to differ from the civilian, rendering certain requirements permissible which would otherwise be unconstitutional. *Id.* at 81, 518 F.2d at 474; *see Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974).[5] For example, the traditional military inspection to examine overall fitness of a unit is a "permissible deviation from that which may be tolerated in civilian society generally—recognizing that such procedure is a reasonable intrusion which a service person might expect in military society." *United States v. Roberts,* 2 M.J. 31, 36 (C.M.A.1976); *see also United States v. Lange,* 15 C.M.A. 486, 35 C.M.R. 458 (1965). Likewise, in *Callaway, supra,* the District of Columbia Circuit Court upheld warrantless drug inspections conducted without probable cause in the military against a Fourth Amendment challenge. 171 U.S.App.D.C. at 83–84, 518 F.2d at 476–77.

In a public employment context, it has been held that because of the paramount interest in ensuring public safety, bus drivers have no reasonable expectation of privacy with regard to submitting to blood and urine tests for the detection of intoxication or drug abuse. *Division 241 Amalgamated Transit Union (AFL–CIO) v. Suscy,* 538 F.2d 1264, 1267 (7th Cir.), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976).

With this backdrop, we must balance the claims of the police officer in a police force context against the public interest. While as a matter of degree we do not necessarily extend to the uniformed civilian services

the same narrowly circumscribed expectation of privacy accorded to members of the military, the fact remains the police force is a para-military organization dealing hourly with the general public in delicate and often dangerous situations. So we recognize that, as is expected and accepted in the military, police officers may in certain circumstances enjoy less constitutional protection than the ordinary citizen. We conclude that this is one of those circumstances.

The Department, like the transit authority in *Suscy, supra,* has a paramount interest in protecting the public by ensuring that its employees are fit to perform their jobs. Without a doubt, drug abuse can have an adverse effect upon a police officer's ability to execute his duties. Given the nature of the work and the fact that not only his life, but the lives of the public rest upon his alertness, the necessity of rational action and a clear head unbefuddled by narcotics becomes self-evident. Thus, the use of controlled substances by police officers creates a situation fraught with serious consequences to the public. Consequently, in the context of current widespread, large scale drug usage in all segments of the population, the Department was justified in promulgating Special Order 83–21 in an effort to prevent the illicit use of narcotics by members of the police force.

The intrusion here is permissible. Under Paragraph 2 of Special Order 83–21, all members of the force may be ordered to submit to urinalysis if "suspected of drug use" by a Department official. While it might have been drafted with more precision, the special order's reference to "suspected" drug use does not grant the Department carte blanche to order testing on a purely subjective basis. Rather, the term "suspected" must be construed here as requiring a reasonable, objective basis for

**5.** In *Parker, supra,* the Supreme Court recognized that "[w]hile the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections." 417 U.S. at 758, 94 S.Ct. at 2563.

medical investigation through urinalysis. This may be a basis short of the traditional "probable cause" but nevertheless sufficient reasonably to warrant some medical investigation. Necessarily, this basis must be related to the police officer's fitness for duty.[6] There must be a reasonable, objective basis to suspect that a urinalysis will produce evidence of an illegal drug use. Because of the clear public interest in ensuring that the police force operates free of narcotics, we consider that, as we here construe the regulation, the intrusion is constitutionally acceptable.[7]

The intrusion of a urinalysis test requires a normal bodily function for this purpose. This is not an extreme body invasion. If we were to require a search warrant, as appellant would have us do, this would necessarily be equating the police officer with a private citizen for the purpose of this medical test. This we think should not be done. The public interest consideration is strong in relation to the test of the police officer, but not in the instance of a private citizen.[8] The normal constitutional requirements in relation to private citizens are not mandated here.

■ We hold the regulation, as construed, is constitutional on its face.[9] The

ruling appealed from is reversed, and the case is remanded for such further proceedings, if any, as may be indicated upon remand to the trial court.[10]

*So Ordered.*

NEBEKER, Associate Judge, concurring:

I concur with the division's ultimate conclusion that Paragraph 2 of Special Order 83–21 is constitutionally valid. I write separately, however, to express my view as to whether a Fourth Amendment interest is implicated in this case at all.

Several other courts have considered the constitutional implications of regulations requiring compulsory urinalysis and have upheld such regulations as reasonable within the Fourth Amendment.[1] These courts have reasoned that although the individuals affected by the regulations had a reasonable expectation of privacy with regard to their body fluids, a balancing of interests required the conclusion that the particular invasion of privacy at issue was not unreasonable within the Fourth Amendment. The parties and thus the division in this case have adopted that analysis; I agree with the analysis, but do not believe we are limited to it in deciding this case.

6. While the provision relating to the Police and Fire Surgeons Board is not before us in this case for decision, it is apparent that the term "discretion" should be construed as meaning an exercise of the professional judgment of the members of the Police and Fire Surgeons Board, reached as a result of observation or indication of a medical nature.

7. With the passage of time and opportunity for more reflection, it may be that the Department will undertake a more artful drafting of the regulation.

8. As a practical matter, this type of evidence might be dissipated if the testing process were to be delayed by a cumbersome procedure, such as a search warrant.

9. There appears to be a trend of such medical testings in the face of the realities of our time relating to widespread narcotics usage. The indication is that there is an effort to protect the public from injury stemming from narcotic us-

age by individuals whose employment by its nature regularly affects the public. *See, e.g., Division 241 Amalgamated Transit Union (AFL–CIO) v. Suscy, supra,* 538 F.2d at 1264; *Allen v. City of Marietta,* 601 F.Supp. 482, 485 (1985).

10. This will depend, among other things, on whether the government desires to proceed further in this case. If so, a factual hearing and findings of fact by the trial judge would be the first step.

1. *Division 241 Amalgamated Transit Union v. Suscy,* 538 F.2d 1264 (7th Cir.1976) (rules requiring bus drivers to submit to urine test following involvement in serious accident held constitutional); *Murray v. Haldeman,* 16 M.J. 74 (C.M.A.1983) (compulsory urinalysis for service members held constitutional); *see also Allen v. City of Marietta,* 601 F.Supp. 482 (N.D.Ga.1985) (urinalysis of government employees suspected of drug use conducted in purely employment context held reasonable within Fourth Amendment).

The United States Supreme Court has recognized that the Fourth Amendment protects two types of expectations, one involving "searches" and the other "seizures." *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). The Court distinguished these two expectations as follows:

> A "search" occurs when an expectation that society is prepared to consider reasonable is infringed. A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.

*Id.* at 1656 (footnotes omitted). The Court has not elaborated on the constitutional implications involved in the "seizure" of an individual's property.[2] There exists, however, a distinction in the case law, which is instructional on this point, that is concerned with obtaining physical evidence from an individual. In the first line of cases, which involve bodily intrusive searches, the Court has recognized that "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Schmerber v. California*, 384 U.S. 757, 768, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). Because the line of cases beginning with *Schmerber* deals with intrusions into the human body—searches of the person—the courts have been careful to allow such activity only if it comports with the requirements of the Fourth Amendment. *Winston v. Lee*, —— U.S. ——, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) (extensive surgery to remove bullet held unreasonable); *United States v. Shields*, 453 F.2d 1235 (9th Cir. 1972) (body cavity search held reasonable); *Hughes v. United States*, 429 A.2d 1339 (D.C.1981) (surgical removal of bullets held reasonable); *United States v. Crowder*, 177 U.S.App.D.C. 165, 543 F.2d 312 (1976) (en banc) (surgical removal of bullets held reasonable), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977).

A second line of cases involves the seizure of an individual's physical characteristics. In this line of cases, the Court has recognized that the seizure does not involve "the probing into an individual's private life and thoughts that marks an interrogation or search." *United States v. Dionisio*, 410 U.S. 1, 15, 93 S.Ct. 764, 772, 35 L.Ed.2d 67 (1973); *see also United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973). Rather, such seizure cases are recognized as being outside of the Fourth Amendment's protection; they do not involve the same degree of intrusion into an individual's privacy because such physical characteristics are constantly exposed to the public. *Dionisio, supra*, 410 U.S. at 14, 93 S.Ct. at 771–72. Behind the Court's reasoning in this line of cases is the fact that the individual subject to the seizure retained no control over those characteristics exposed to the public and, therefore, retained no privacy interest in them. It is this precise reasoning that, in my view, should be applied to the case before us.

In this case, the appropriate analysis begins with determining whether the seizure of urine interferes with the affected officer's possessory interest in that urine. Quite naturally, in determining whether such an interference has occurred, we must consider both the existence and reasonableness of the officer's expectation of privacy. In *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the Court established a two-part test, albeit in the context of a "search," to determine whether a reasonable expectation of privacy exists.

> The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy,"—whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize

2. *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 1656 n. 5, 80 L.Ed.2d 85 (1984).

as 'reasonable,' "—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances.

*Id.* at 740–41, 99 S.Ct. at 2580–81 (citations omitted). Applying the above test to the case before us, we must first consider whether a police officer holds a subjective expectation of privacy in his body waste. It is obvious that body waste is forever discarded upon release from the body. An individual cannot retain a privacy interest in a waste product that, once released, is flushed down the drain. Under Special Order 83–21, the suspected officer, in a purely employment context, is required to deposit his urine in a receptacle other than the drain. Once the officer urinates he cannot logically retain any possessory or privacy interest in it. In fact, in the interest of public health and safety, it is difficult to conceive of any possessory interest the officer should be allowed to retain in his urine. It would strain logic to conclude other than that a police officer cannot hold a subjective expectation of privacy in body waste that must pass from his system.

Special Order 83–21 is concerned with urinalysis testing, *i.e.,* the testing of a urine sample. The special order requires "any member of the force suspected of ... drug use ... to submit to urinalysis testing": to be sure, it is the officer's urine sample that must be submitted for testing and not the officer himself. The same is true of voice and handwriting exemplars. Thus, we have no seizure of the suspected police officer. The employment context in which the sample is given eliminates any issue of seizure of the officer's person. In the handwriting and voice sample cases it was necessary for the suspect to go to the place commanded in the subpoena to perform the required act.

In order for our analysis to be complete, however, we must consider whether an officer holds a subjective expectation of privacy in the act of discharging body waste. Admittedly, the act of urination is a private one and, if interfered with, protected by the Fourth Amendment. It is important to note that the special order, on its face, does not interfere with the manner of discharge; the suspected officer is only required to submit to urinalysis testing, *i.e.,* to submit a urine sample for analysis. If we assume, however, that the special order does, in some slight way, interfere with an officer's subjective expectation of privacy in the act of urination, we must then consider whether this expectation is one that society is prepared to recognize as "reasonable" under the circumstances of Special Order 83–21. *See Smith v. Maryland, supra,* 442 U.S. at 740, 99 S.Ct. at 2580.

Any interference with an officer's expectation of privacy in the manner of discharge of body waste would be minimal. The required act is no different than the consensual act of providing a personal physician with urine samples as part of a routine physical examination. Special Order 83–21 creates no greater invasion of privacy for the officer suspected of drug use; the officer would be expected to produce a urine sample in a receptacle that has been provided for that purpose. Because the EMIT Cannabinoid Assay test can detect the presence of narcotics for a period of seven days or more after use, the suspected officer will never be required to produce an on-the-spot sample out of fear that any drug tracings will dissipate. This extended time period for drug detection also allows the Police and Fire Clinic greater flexibility in requesting a urine sample from a suspected officer and, thereby, eliminates unnecessary interference with the officer's job or personal life. Any interference with an officer's subjective expectation of privacy that results from Special Order 83–21 would certainly be offset by the significant benefit to the public in having a drug free police force. I, thus, find no reasonable expectation of privacy entailed in the application of Special Order 83–21.