**NATIONAL FEDERATION OF FEDERAL EMPLOYEES, et al., Appellants**

v.

**Caspar W. WEINBERGER, Secretary of Defense, et al.**

**No. 86–5432.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 24, 1987.

Decided May 15, 1987.

As Amended May 22, 1987.

Bruce P. Heppen, with whom H. Stephan Gordon and Clinton D. Wolcott, Washington, D.C., were on the brief for appellants.

Robert V. Zener, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellees.

Mark D. Roth and Joe Goldberg, Washington, D.C., were on the brief for amicus curiae, American Federation of Government Employees, urging remand to the District Court.

Lois G. Williams and Elaine Kaplan, Washington, D.C., were on the brief for amicus curiae, National Treasury Employees Union, urging reversal of the District Court decision.

Before EDWARDS and R.B. GINSBURG, Circuit Judges, and FAIRCHILD,* Senior Circuit Judge,

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge EDWARDS.

### HARRY T. EDWARDS, Circuit Judge:

In this case, we review the District Court's dismissal of a suit to enjoin officials of the Department of Defense from implementing a mandatory urinalysis drug testing program for certain of their civilian employees, as well as the court's denial of the appellants' motion for a preliminary injunction, 640 F.Supp. 642. At this stage, we find it inappropriate to decide the merits of the case because the District Court did not address them, basing its decision instead on a jurisdictional theory that was advanced by the government below but which the government now concedes is utterly inconsistent with the law of this circuit.

We conclude that the District Court clearly had jurisdiction to hear the appellants' challenge and the authority to grant the equitable relief requested. We therefore reverse the trial court's dismissal, vacate its denial of the appellants' motion for a preliminary injunction, and remand the case to the District Court for further proceedings on the merits consistent with the general principles outlined in Part II.B. of this opinion.

## I. BACKGROUND

On April 8, 1985, the Department of Defense ("DoD") issued Directive 1010.9 (the "Directive") authorizing each military department to establish a Civilian Employees Drug Abuse Testing Program. The program requires civilian employees in "critical jobs" and applicants for such positions to participate (and to sign a form agreeing to participate) in urinalysis drug testing in the following four circumstances: (1) before appointment or selection, (2) periodically thereafter "on the basis of neutral criteria," (3) when there is probable cause to believe that the employee is "under the

influence of a controlled substance while on duty," [1] and (4) in the course of investigating an accident "for the purpose of accident analysis and the development of countermeasures." DoD Directive 1010.9, at 3 (Apr. 8, 1985). The Assistant Secretary of Defense (Manpower, Installations and Logistics) must concur in the decisions of the heads of the various DoD components to designate certain jobs or classes of jobs as "critical." Those jobs must fall within one or more of the following categories of jobs that are deemed "sufficiently critical to the DoD mission or protection of public safety that screening to detect the presence of drugs is warranted as a job-related requirement": (1) jobs in law enforcement, (2) positions involving national or internal DoD security in which drug abuse "could cause disruption of operations, destruction of property, threats to the safety of personnel, or the potential for unwarranted disclosure of classified information," and (3) jobs involving protection of property or persons from harm. *Id.* at 1–3.

The stated purposes of the program are to:

1. Assist in determining fitness for appointment or assignment to, or retention in, a critical job.

2. Identify drug abusers and notify them of the availability of appropriate counseling, referral, rehabilitation, or other medical treatment.

3. Assist in maintaining the national security and the internal security of the Department of Defense by identifying persons whose drug abuse could cause disruption of operations, destruction of property, threats to the safety of themselves and others, or the potential for unwarranted disclosure of classified information through drug-related blackmail.

*Id.* at 2.

On February 10, 1986, the Department of the Army promulgated regulations implementing Directive 1010.9. Army Regulation 600–85, Interim Change No. I11 (Feb. 10, 1986) ("Interim Change"). The Interim

---

1. The Directive defines "controlled substance[s]" as those substances listed in 21 U.S.C. § 812 (1982 & Supp. III 1985). DoD Directive 1010.9, at 1.

Change specifies that employees in critical jobs, as well as applicants for those jobs, must sign DA Form 5019–R, titled "Condition of Employment for Certain Civilian Positions Identified as Critical Under the Drug Abuse Testing Program." Interim Change at 2. An applicant for a critical job who fails to sign the form will not be considered for the position, and an employee currently holding a critical job who fails to sign the form "will be voluntarily or involuntarily reassigned or demoted to a noncritical job or separated from Federal employment." DA Form 5019–R. Persons who sign the form but later refuse to submit to testing "will be non-selected, reassigned, demoted, or separated according to applicable regulations." *Id.* The signature form also notifies the employee that "[t]o assure the validity of these tests, a staff member of the same sex will observe you while you are providing the sample," [2] and that "[m]edically prescribed drugs authorized by a physician and confirmed by appropriate evidence are excluded from such determinations." *Id.* The form warns that "[d]etection of drug usage through confirmed positive urinalysis test results may be cause for a determination that you have failed to meet the conditions necessary for your continued employment in the position." *Id.* The Interim Change is more specific as to the consequences of testing positive:

In the event of a confirmed positive urinalysis test result or refusal to submit a specimen—

(a) Prospective employees will be denied further consideration for appointment to the critical job.

(b) Current employees may be subject to adverse action proceedings under FPM chapter 752, FPM Supplement 752–1, and AR 690–700, chapter 751.

Interim Change at 2. These "adverse action proceedings" may include involuntary reassignment, demotion or removal from federal service. Civilian Drug Abuse Testing Program, Draft Memorandum at 1, *reprinted in* Joint Appendix ("J.A.") 33.

The plaintiffs-appellants in this case are the National Federation of Federal Employees ("NFFE"), a labor organization whose membership includes substantial numbers of civilian DoD and Department of the Army employees; NFFE Local 2058, which represents a bargaining unit of 190 civilian guards employed by the Army at the Aberdeen Proving Ground; and Charles W. Jackson, a civilian Aberdeen guard and president of Local 2058. On March 13, 1986, these plaintiffs filed suit in the District Court, alleging that the Army's civilian drug testing regulations violate: (1) the Fourth Amendment's ban on unreasonable searches and seizures; (2) the due process clause of the Fifth Amendment; (3) the employees' constitutional right of privacy; (4) 5 U.S.C. § 706(2)(C) (1982),[3] insofar as

---

2. On September 15, 1986, while this appeal was pending, President Reagan issued an Executive Order directing executive agencies to establish drug testing programs for employees in sensitive positions. Exec. Order No. 12,564, 51 Fed. Reg. 32,889 (1986). Section 4(c) of the Executive Order provides that "[p]rocedures for providing urine specimens must allow individual privacy, unless the agency has reason to believe that a particular individual may alter or substitute the specimen to be provided." The Army implemented section 4(c) on October 10, 1986, by sending a message to all its installations providing that "[i]ndividual privacy shall be assured by permitting employees or applicants to produce urine specimens alone in closed stalls or other similar structures or enclosures. There will be no observation of an employee's or applicant's private anatomy." Message to Army Installations re Civilian Urinalysis Program at 1, *reprinted in* Brief for Appellees, Attachment 2. The Army's message does contemplate, how-

ever, that "direct," presumably visual, observation during urination is permissible if the supervisor has reason to "believe or suspect that an employee or applicant is attempting to adulterate or substitute the sample." *Id.*

3. Section 706(2) provides, in relevant part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

the regulations conflict with 42 U.S.C. § 290ee–1 (Supp. III 1985),[4] which prohibits discrimination in federal civilian employment on the basis of prior drug use; and (5) 5 U.S.C. § 706(1)(A) (1982),[5] insofar as the regulations are arbitrary, capricious and an abuse of discretion. The complaint named as defendants the Secretary of Defense, the Secretary of the Army, and the Commander of the Installation Support Activity at Aberdeen, all in their official capacities. In addition to seeking a declaration from the court that their rights had been violated and that the program violated 42 U.S.C. § 290ee–1, the plaintiffs requested an injunction (1) prohibiting the defendants from administering urinalysis drug tests without probable cause and a warrant, (2) prohibiting the defendants from taking any actions against employees based on positive field test results, and (3) ordering the defendants to rescind both the Directive and the Interim Change. Complaint, *reprinted in* J.A. 4.

On March 21, 1986, the plaintiffs moved for a preliminary injunction forbidding the defendants from implementing the challenged regulations and from distributing DA Form 5019–R. The defendants responded with a motion to deny the preliminary injunction and to dismiss the entire complaint for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), and for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6). On June 23, 1986, the District Court granted the motion to dismiss solely on 12(b)(1) grounds, holding that "the plaintiffs must pursue their constitutional and statutory

challenges to the drug abuse testing program within the administrative framework of the [Civil Service Reform Act] and not in this forum." *National Fed'n of Fed. Employees v. Weinberger,* 640 F.Supp. 642, 650 (D.D.C.1986).

The plaintiffs appeal this dismissal. Besides seeking a reversal of the District Court's jurisdictional holding, they urge this court to decide the merits of their motion for a preliminary injunction, even though the District Court did not reach the merits below.

## II. Analysis

### A. *Jurisdiction*

In the proceedings below, the government's attorneys argued that the District Court lacked subject matter jurisdiction over the plaintiffs' claims, and, rather remarkably, counsel succeeded in persuading the trial court to agree. Summarized briefly, the government's argument was that the District Court's federal question jurisdiction did not extend to the subject matter of the plaintiffs' action, because it involved a "labor-management dispute governed by the exclusive jurisdictional provisions of the Civil Service Reform Act [of 1978]" ("CSRA"), Pub.L. No. 95–454, 92 Stat. 1111 (codified as amended in 5 U.S.C. § 1201 *et seq.* (1982 & Supp. III 1985)). Therefore, the government contended, the plaintiffs' claims could be heard only by the Federal Labor Relations Authority ("FLRA") or the Merit Systems Protection Board ("MSPB"), subject to judicial review by a federal ap-

---

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right....

5 U.S.C. § 706(2)(A)–(C) (1982).

**4.** Section 290ee–1 provides, in relevant part:

(c) Disqualification solely on ground of prior drug abuse prohibited; certain agencies, national security employment, and sensitive positions excepted from restriction

(1) No person may be denied or deprived of Federal civilian employment or a Federal profession or other license or right solely on the ground of prior drug abuse.

(2) This subsection shall not apply to employment (A) in the Central Intelligence Agency, the Federal Bureau of Investigation, the National Security Agency, or any other de-

partment or agency of the Federal Government designated for purposes of national security by the President, or (B) in any position in any department or agency of the Federal Government, not referred to in clause (A), which position is determined pursuant to regulations prescribed by the head of such department or agency to be a sensitive position.

(d) Dismissal for functional disability

This section shall not be construed to prohibit the dismissal from employment of a Federal civilian employee who cannot properly function in his employment.

42 U.S.C. § 290ee–1(c), (d) (Supp. III 1985).

**5.** *See* note 3 *supra.*

pellate court. Memorandum in Support of Defendants' Motion to Dismiss and in Opposition to Plaintiffs' Motion for Preliminary Injunction, Record Doc. No. 9, at 10.

On appeal, counsel conceded in open court that the government had no legal basis for making this argument; unfortunately, this concession came too late to avoid the expenditure of judicial efforts and energy that were needlessly wasted on a theory that is completely baseless. To discourage any future litigant who might have the effrontery to engage the District Court with this discredited theory of subject matter jurisdiction, we briefly review the law of this circuit for what we trust will be the last time.

■ In dismissing this action for lack of subject matter jurisdiction, the District Court accepted the government's argument that federal court jurisdiction was barred by the Supreme Court's holding in *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). As we held in *Doe v. United States Department of Justice,* 753 F.2d 1092 (D.C.Cir.1985), and as the government now concedes, *Bush* is inapposite. In *Bush,* the Supreme Court declined to create a *damages* remedy to supplement the statutory remedies available to federal employees for redressing past violations of their constitutional rights. In contrast, this court has expressly held that *Bush* does not affect the traditional and well-settled authority of federal courts to *enjoin* unconstitutional government actions:

> *Bush* held only that where civil servants enjoy meaningful *and constitutionally adequate* statutory remedies for first amendment violations, federal courts should not imply an additional *Bivens-type damages remedy* under the constitution. The *Bush* holding in no way affects the scope of constitutional rights, and nothing in *Bush* or any other Court

opinion casts doubt on the presumed availability of federal equitable relief against federal officials for committing constitutional violations.

*Id.* at 1109 n. 17 (citations omitted) (emphasis in original). Our other decisions both before and after *Bush* have made it absolutely clear that civilian federal employees may seek to enjoin government actions that violate their constitutional rights. *See Hubbard v. United States Envtl. Protection Agency,* 809 F.2d 1, 10 (D.C.Cir.1986), *rehearing en banc granted on other grounds,* 809 F.2d 15 (D.C.Cir.1987); *Spagnola v. Mathis,* 809 F.2d 16, 23 n. 8, 25 (D.C.Cir.1986), *rehearing en banc granted on other grounds,* 809 F.2d 40 (D.C.Cir. 1987); *id.* at 38–39 (Silberman, J., concurring in part and dissenting in part); *Cutts v. Fowler,* 692 F.2d 138, 139–40 (D.C.Cir. 1982).

■ Having conceded the error of its ways, the government now suggests weakly, and only on appeal, that there might be an argument for requiring exhaustion of administrative remedies as a prudential matter in this case. We reject this suggestion for three reasons. First, the argument was not raised in the District Court, and ordinarily we will not entertain legal theories raised for the first time on appeal. *See District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084–85 (D.C.Cir.1984). Second, even if we did consider the argument to be timely, our decision in *Andrade v. Lauer,* 729 F.2d 1475, 1484 (D.C.Cir. 1984), suggests that exhaustion is unnecessary with respect to the constitutional claims asserted here.[6] Third, the government concedes that the administrative mechanism will leave many of the affected employees remediless. A FLRA proceeding, focused on the duty to bargain, will not resolve issues concerning the legality of the drug testing program.[7] The other

---

**6.** *Andrade* held that the exhaustion doctrine applies only where the purposes of the doctrine would be served thereby. 729 F.2d at 1484. Those purposes are: (1) to carry out congressional intent in granting authority to the agencies; (2) to protect agency autonomy; (3) to aid judicial review by developing a factual record; and (4) to avoid repetitive adjudication or to

avoid judicial involvement at all. *Id.* The government has failed to establish that any of these purposes would be served where, as here, the administrative bodies are incapable of granting the relief sought before irreparable injury occurs.

**7.** If the union files a complaint with the FLRA, it can only seek a determination that the drug

route of administrative appeal, proceedings before the MSPB, will be unavailable to employees who test negative and who therefore incur no adverse personnel actions, as well as to employees whose positive test results lead to personnel actions, such as transfers, which are not "adverse" and which are therefore not appealable to the MSPB.[8]

We also reject as legal error the District Court's suggestion that prospective injunctive relief is somehow barred by the availability of the damages remedy authorized in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), to redress violations of the Fourth Amendment rights of the employees who test negative or who are subjected to personnel actions that are not administratively appealable. *Weinberger,* 640 F.Supp. at 654. Even if we assume the availability of a retroactive *Bivens* remedy against the individual government officials involved in the drug testing program,[9] it simply does not follow that prospective equitable relief against the agency is therefore barred, and there is no authority even suggesting that such a bar exists. The absence of authority for the District Court's proposition is hardly surprising. In the first place, the two remedies are simply not equivalent. The damages remedy penalizes an individual government official for his or her past wrongs; it does not purport to affect the agency itself, nor does it enjoin any future actions by the agency or its officers. The availability of a *Bivens* remedy for a particular wrong simply cannot—and was never intended to—protect an individual who is threatened with future deprivation of a constitutional right. A *Bivens* remedy does not require proof that the federal officer was acting within the dictates of official agency policy or practice; *Bivens* is expressly applicable to any "federal agent acting *under color* of his authority." 403 U.S. at 389, 91 S.Ct. at 2001 (emphasis added). Likewise, the awarding of a *Bivens* remedy does not compel the government to alter its policies or practices. In contrast, that is the precise function of prospective injunctive relief.[10]

■ We therefore hold that the District Court's federal question jurisdiction extends to the subject matter of this dispute,[11] and that the court has the power to

---

testing program is subject to collective bargaining. Accordingly, the FLRA will rule on the negotiability of the program, not its legality. And, in defending against a union request for bargaining rights, the government surely will not argue that its drug testing program is illegal. So, no matter how the FLRA rules on the negotiability issue, an appeal will not involve the legality of the drug testing program.

8. We also reject as plainly meritless the government's belated invocation of the doctrine of primary jurisdiction. The government fails to demonstrate that the issues material to this case "have been placed within the special competence of an administrative body." *United States v. Western Pac. R.R.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

9. On appeal, the government disavows any reliance on the District Court's suggestion that the availability of a *Bivens* remedy somehow deprives a federal court of its jurisdiction to enjoin unconstitutional government actions. The government suggests that such a damages remedy would be barred by the doctrine of qualified immunity as articulated in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Because we reject the District Court's suggestion on other grounds, we find it unneces-

sary to address the applicability of *Harlow* immunity to the government actions at issue, beyond noting that the potential applicability of qualified immunity renders the availability of a *Bivens* remedy in the instant case less than certain.

10. We also disapprove of the District Court's reliance on the principle that a federal court should hesitate to enjoin an ongoing statutorily-authorized investigation by an administrative agency on the ground that the proceeding is unconstitutional. 640 F.Supp. at 654–55 (citing *Hastings v. Judicial Conference of United States,* 770 F.2d 1093, 1102 (D.C.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986)). Such abstention is simply inapplicable where, as here, the agency action presents an "immediate and concrete" threat of a constitutional deprivation. *See Hastings,* 770 F.2d at 1102.

11. The District Court also erred in concluding that review of the drug testing program was unavailable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* (1982 & Supp. III 1985). The APA creates no bar to a legitimate constitutional challenge to an agency rule or policy. In this case, the program is clearly

grant the equitable relief requested. Accordingly, we reverse the court's dismissal of the appellants' complaint and vacate its denial of the motion for a preliminary injunction, and we remand the case to the trial court for a determination on the merits consistent with the principles outlined below.

## B. *The Fourth Amendment Claims*

Because the District Court dismissed the appellants' complaint for lack of subject matter jurisdiction, the trial court made no findings of fact and offered no judgment on the legality of the drug testing program. On appeal, both the government and the appellants have fully briefed and argued the merits, and both sides have urged this court, in the interest of judicial economy, to reach the constitutional issues posed by this case. However, the absence of a factual record militates against this course, for it is clear that certain of the legal judgments yet to be rendered will hinge on findings of fact yet to be made with respect to the nature and scope of the drug testing program.

Few legal issues in the Fourth Amendment domain are so pure that they do not turn on *any* facts or circumstances peculiar to the case. Nonetheless, without infringing on the District Court's resolution of fact-laden questions, we can provide some guidance for the task to be tackled on remand.

■ Compulsory urinalysis of public sector employees, we hold in common with our sister circuits, qualifies as a "search and seizure" within the meaning of the Fourth Amendment. *See National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 176 (5th Cir.1987); *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir.1987); *Division 241 Amalgamated Transit Union v. Suscy*, 538 F.2d 1264, 1266–67 (7th Cir.),

*cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976); *cf. Shoemaker v. Handel*, 795 F.2d 1136, 1142 (3d Cir.1986). This is true whether or not the urinalysis procedures employed involve direct visual inspection of urination. *See American Fed'n of Gov't Employees v. Weinberger*, 651 F.Supp. 726, 732–34 (S.D.Ga.1986); *Allen v. City of Marietta*, 601 F.Supp. 482, 488–89 (N.D.Ga.1985). Qualification as a "search," however, "only ... begin[s] the inquiry into the standards governing such searches," *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985), for the Fourth Amendment safeguards persons only against "unreasonable searches and seizures." Determining the "standard of reasonableness applicable to a particular class of searches requires 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *O'Connor v. Ortega*, — U.S. —, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987) (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)).

■ On one side of this balance, in the matter at hand, are the employees' reasonable expectations of privacy—those expectations which society is "prepared to recognize as legitimate." *T.L.O.*, 469 U.S. at 338, 105 S.Ct. at 741 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); *see also O'Connor*, 107 S.Ct. at 1497–99. On the other side of the balance is "[t]he governmental interest [in] the efficient and proper operation of the workplace." *O'Connor*, 107 S.Ct. at 1501; *see also McDonell*, 809 F.2d at 1308 (governmental interest in "determining whether ... employees are using or abusing drugs which would affect their

---

an "agency action" within the meaning of the APA's judicial review provisions, *see id.* §§ 551(13), 551(4), 704. Furthermore, section 701(a)(2) precludes review only where a statute is drawn in such broad terms that "there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (quoting S.Rep.

No. 752, 79th Cong., 1st Sess. 26 (1945)); *see Grace Towers Tenants Ass'n v. Grace Housing Dev. Fund Co.*, 538 F.2d 491, 496 (2d Cir.1976) (commitment to agency discretion does not preclude review of questions pertaining to agency's jurisdiction or compliance with statutory or constitutional requirements). Here, there is clearly "law to apply"—the Constitution.

ability to safely perform their work" may support reasonableness determination). This balancing inquiry has two reference points: the court must determine first "whether the [search] was justified at its inception," *T.L.O.*, 469 U.S. at 341–42, 105 S.Ct. at 743–44 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968))—*i.e.*, whether "reasonable grounds [exist] for suspecting that the search will turn up evidence" of work-related drug use, *id.* 469 U.S. at 342, 105 S.Ct. at 744; *and* second, "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place,' " *id.* at 341, 105 S.Ct. at 743 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879)—*i.e.*, whether "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive," *id.* 469 U.S. at 342, 105 S.Ct. at 744.[12]

■■ We hold, too, that a search otherwise unreasonable cannot be redeemed by a public employer's exaction of a "consent" to the search as a condition of employment. *See Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *McDonell*, 809 F.2d at 1310. Advance notice of the employer's condition, however, may be taken into account as one of the factors relevant to the extent of the employees' legitimate expectations of privacy. *See Shoemaker*, 795 F.2d at 1142; *Security & Law Enforcement Employees v. Carey*, 737 F.2d 187, 202 (2d Cir.1984).

Beyond these general principles, we leave to the District Court the decision on the merits of the preliminary injunction motion and the underlying claims.

*Reversed and remanded.*

---

**12.** The government may not take advantage of any arguably relaxed "employer" standard for warrantless searches to impose drug testing when its true purpose is to obtain evidence of criminal activity without complying with the more stringent standards that normally protect citizens against unreasonably intrusive evidence-gathering. *See United States v. Hagarty*, 388 F.2d 713, 717–18 (7th Cir.1968); *United States v. Blok*, 188 F.2d 1019, 1020–21 (D.C.Cir. 1951); *Weinberger*, 651 F.Supp. at 735–36; *Allen*, 601 F.Supp. at 489–91; *United States v. Kahan*, 350 F.Supp. 784, 791–93 (S.D.N.Y.1972), *aff'd in part and rev'd in part on other grounds*, 479 F.2d 290 (2d Cir.1973), *rev'd on other grounds*, 415 U.S. 239, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974). "Operation of a government agency and enforcement of criminal law do not amalgamate to give a right of search beyond the scope of either." *Blok*, 188 F.2d at 1021.